THE PITTSTON COMPANY; Buffalo Mining Company; Clinchfield Coal Company; Eastern Coal Corporation; Elkay Mining Company; Jewell Ridge Coal Corporation; Kentland–Elkhorn Coal Corporation; Meadow River Coal Company; Pittston Coal Group; Ranger Fuel Corporation, Plaintiffs–Appellants,

v.

UNITED STATES of America, Defendant & Third Party Plaintiff-Appellee,

v.

Michael H. Holland, Trustee of the United Mine Workers of America Combined Benefit Fund; United Mine Workers Of America Combined Benefit Plan; Elliot A. Segal, Trustee of the United Mine Workers of America Combined Benefit Fund; William P. Hobgood, Trustee of the United Mine Workers of America Combined Benefit Fund; Marty D. Hudson, Trustee of the United Mine Workers of Amer-

ica Combined Benefit Fund; Thomas O.S. Rand, Trustee of the United Mine Workers of America Combined Benefit Fund; Gail R. Wilensky, Trustee of the United Mine Workers of America Combined Benefit Fund; Carl E. Van Horn, Trustee of the United Mine Workers of America Combined Benefit Fund; Carlton R. Sickles, Trustee of the United Mine Workers of America Combined Benefit Fund, Third Party Defendants–Appellees,

The Bituminous Coal Operators' Association, Incorporated, Intervenor,

and

International Union, United Mine Workers of America, Party in Interest.

The Pittston Company; Buffalo Mining Company; Clinchfield Coal Company; Eastern Coal Corporation; Elkay Mining Company; Jewell Ridge Coal Corporation; Kentland–Elkhorn Coal Corporation; Meadow River Coal Company; Pittston Coal Group; Ranger Fuel Corporation, Plaintiffs–Appellants,

v.

United States of America, Defendant & Third Party Plaintiff-Appellee,

v.

Michael H. Holland, Trustee of the United Mine Workers of America Combined Benefit Fund; United Mine Workers Of America Combined Benefit Plan; Elliot A. Segal, Trustee of the United Mine Workers of America Combined Benefit Fund; William P. Hobgood, Trustee of the United Mine Workers of America Combined Benefit Fund; Marty D. Hudson, Trustee of the United Mine Workers of Amer-

of America Combined Benefit Fund; Thomas O.S. Rand, Trustee of the United Mine Workers of America Combined Benefit Fund; Gail R. Wilensky, Trustee of the United Mine Workers of America Combined Benefit Fund; Carl E. Van Horn, Trustee of the United Mine Workers of America Combined Benefit Fund; Carlton R. Sickles, Trustee of the United Mine Workers of America Combined Benefit Fund, Third Party Defendants–Appellees,

and

The Bituminous Coal Operators' Association, Incorporated; International Union, United Mine Workers Of America, Parties in Interest.

The Pittston Company; Buffalo Mining Company; Clinchfield Coal Company; Eastern Coal Corporation; Elkay Mining Company; Jewell Ridge Coal Corporation; Kentland–Elkhorn Coal Corporation; Meadow River Coal Company; Pittston Coal Group; Ranger Fuel Corporation, Plaintiffs–Appellants,

v.

United States of America, Defendant & Third Party Plaintiff-Appellee,

Michael H. Holland, Trustee of the United Mine Workers of America Combined Benefit Fund; United Mine Workers Of America Combined Benefit Plan; Elliot A. Segal, Trustee of the United Mine Workers of America Combined Benefit Fund; William P. Hobgood, Trustee of the United Mine Workers of America Combined Benefit Fund; Marty D. Hudson, Trustee of the United Mine Workers of America Combined Benefit Fund; Thomas O.S. Rand, Trustee of the 6 United Mine Workers of America Combined Benefit Fund; Gail R. Wilensky, Trustee of the United Mine Workers of America Combined Benefit Fund; Carl E. Van Horn, Trustee of the United Mine Workers of America Combined Benefit Fund; Carlton R. Sickles, Trustee of the United Mine Workers of America Combined Benefit Fund, Third Party Defendants–Appellees,

and

The Bituminous Coal Operators' Association, Incorporated; International Union, United Mine Workers Of America, Parties in Interest.

Nos. 02–2199, 02–2200, 03–1351.

United States Court of Appeals, Fourth Circuit.

May 18, 2004.

Argued: Jan. 21, 2004.

Decided: May 18, 2004.

lottesville, Virginia, for Appellants. Robert D. McCallum, Jr., Assistant Attorney General, Paul J. McNulty, United States Attorney, Mark B. Stern, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., for Federal Appellee. D. Eugene Webb, Jr., Richard F. Hawkins, III, Troutman Sanders, L.L.P., Richmond, Virginia; Stephen J. Pollak, John Townsend Rich, Jeffrey D. Fox, Shea & Gardner, Washington, D.C., for Appellees Trustees of the United Mine Workers of America Combined Benefit Fund and the United Mine Workers of America Combined Benefit Plan. Peter Buscemi, Stanley F. Lechner, Morgan, Lewis & Bockius, L.L.P., Washington, D.C., for Intervenor.

Before WILKINS, Chief Judge, and NIEMEYER and TRAXLER, Circuit Judges.

Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge TRAXLER joined. Chief Judge WILKINS wrote an opinion concurring in part and dissenting in part.

## OPINION

NIEMEYER, Circuit Judge:

**ARGUED:** Wade Wallihan Massie, Penn, Stuart & Eskridge, Abingdon, Virginia, for Appellants. Ara B. Gershengorn, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., for Federal Appellee; Howard Robert Rubin, Shea & Gardner, Washington, D.C., for Appellees Trustees of the United Mine Workers of America Combined Benefit Fund and the United Mine Workers of America Combined Benefit Plan. **ON BRIEF:** Stephen M. Hodges, Penn, Stuart & Eskridge, Abingdon, Virginia; Gregory B. Robertson, Hunton & Williams, Richmond, Virginia; A.E. Dick Howard, Char-

These appeals challenge the constitutionality of the Coal Industry Retiree Health Benefits Act of 1992 (the "Coal Act"), 26 U.S.C. §§ 9701–9722. In response to severe financial difficulties that were undermining the National Bituminous Coal Wage Agreements ("NBCWAs")—collective bargaining agreements between the Bituminous Coal Operators' Association and the United Mine Workers of America, promising healthcare benefits to active and retired coal miners—Congress enacted the Coal Act to preserve benefits promised by the NBCWAs to retired coal miners. The

Coal Act requires coal operators who had signed NBCWAs over the years to pay premiums into a trust fund in an amount related to the number of retired coal miners they have employed, thereby creating a common trust fund from which the promised healthcare benefits can be paid. ·

In *Eastern Enterprises v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), the Supreme Court held that the Coal Act was unconstitutional insofar as it imposed severe retroactive liability on a coal company that had not signed a labor agreement since 1964.

In challenging the constitutionality of the Coal Act and its application following the decision in *Eastern Enterprises,* the Pittston Company contends in this case: (1) that the Coal Act unconstitutionally violates nondelegation and separation of powers principles by placing governmental powers in the hands of the trustees of the common trust fund, a private entity created by the Coal Act; (2) that the Coal Act is nonseverable and therefore the decision in *Eastern Enterprises* invalidating application of the Coal Act to certain coal operators invalidates it as to all coal operators; and (3) the Social Security Commissioner's reassignment of beneficiaries to the Pittston Company after the decision in *Eastern Enterprises* was accomplished through an impermissible interpretation of the Coal Act's language, resulting in larger premiums for the Pittston Company. The Pittston Company has also raised two administrative issues: it has urged that this court hold in abeyance review of the district court's ruling that the Coal Act does not violate the Due Process Clause or the Takings Clause of the Fifth Amendment, pending Supreme Court review of our decision in *A.T. Massey Coal Co. v. Massanari,* 305 F.3d 226 (4th Cir.2002); and it has assigned as an abuse of discretion the district court's refusal to unseal confiden-

tial documents produced to the Pittston Company by the Bituminous Coal Operators' Association and made part of the record in this case.

The district court rejected Pittston's substantive arguments and denied its motion to unseal the confidential documents. For the reasons that follow, we deny as moot the motion to hold the Fifth Amendment issue in abeyance, and we affirm on the remaining issues.

I

The Coal Act's enactment in 1992 was the culmination of a long history involving bituminous coal companies (represented by the Bituminous Coal Operators' Association ("BCOA")), the United Mine Workers of America ("UMWA"), and collective bargaining agreements between them, beginning with the NBCWA signed in 1947. The Supreme Court has detailed this history in *Eastern Enterprises,* 524 U.S. at 504–15, 118 S.Ct. 2131, and we draw on that history here only briefly to provide context to the issues presented on appeal.

A

The NBCWA negotiated in 1947 between the BCOA and the UMWA provided pension and medical benefits to coal miners and their families through a trust fund created by the 1947 NBCWA. This trust fund became a multiemployer trust fund in the 1950 NBCWA, funded by coal operators with royalties paid in proportion to the operators' coal production.

Upon enactment of the Employee Retirement Income Security Act of 1974 ("ERISA"), which imposed specific funding and vesting requirements on the NBCWAs and other similar agreements, the UMWA and the BCOA entered into the 1974 NBCWA, which replaced the trust fund in the 1950 NBCWA with four separate

trusts, again funded by royalties on coal production and premiums based on employee hours. The 1974 NBCWA was, as the Supreme Court noted in *Eastern Enterprises,* "the first agreement between the UMWA and the BCOA to expressly reference health benefits for retirees." 524 U.S. at 509, 118 S.Ct. 2131.

The trust funds created by the 1974 NBCWA soon began to experience financial difficulties, and to address them, the 1978 NBCWA assigned responsibility to signatory coal operators for the healthcare of all of their own current and former employees. In addition, under the 1978 NBCWA, the coal operators for the first time became responsible for funding specific benefits for employees, rather than simply paying a predetermined amount of royalties to a trust fund based on coal production. Nonetheless, the trust funds continued to experience financial difficulties, and more and more coal operators abandoned the NBCWAs, choosing to hire only nonunion employees or electing to leave the coal business altogether. Those developments left remaining NBCWA signatories with yet heavier financial obligations, which in turn prompted still more coal operators to leave. In this downward spiral, the incentive to abandon the NBCWAs became greater as fewer companies were left to bear the burdens, and with the 1988 NBCWA, the UMWA and the BCOA began imposing withdrawal liability on NBCWA signatories. Despite this measure, the trust funds had, by 1990, run up a deficit of about $110 million. A Senate subcommittee conducting hearings on the Coal Act was advised in 1991 that more than 120,000 coal miner retirees had become at risk of not receiving "the benefits they were promised." *Eastern Enterprises,* 524 U.S. at 513, 118 S.Ct. 2131.

## B

In 1992, Congress enacted the Coal Act to identify the coal operators most respon-sible for benefit plan liabilities and to enlist them to provide benefits to retirees under a new comprehensive plan. The Coal Act merged the earlier trust funds of the NBCWAs into a new multiemployer trust fund called the United Mine Workers of America Combined Benefit Fund ("Combined Fund"). 26 U.S.C. § 9702. This new Combined Fund was constituted to provide "substantially the same" health benefits to retirees and their dependents that they were receiving under the 1950 and 1974 NBCWAs as of January 1, 1992. *Id.* §§ 9703(b)(1), (f). To continue financing the Combined Fund, the Coal Act assessed annual premiums against "signatory operators"—coal operators that had signed any agreement requiring contributions to the earlier trust funds, *id.* §§ 9701(b)(1), (b)(3), (c)(1), and who remained "in business" (defined by the statute as any person who "conducts or derives revenue from any business activity, whether or not in the coal industry"), *id.* § 9706(a); *id.* § 9701(c)(7). If a signatory coal operator was no longer in business, liability for payment of the premium passed to any "related person." *Id.* § 9706(a); *id.* § 9701(c)(2)(A).

The premiums assessed against each signatory operator depended on the number of beneficiaries assigned to it, and the assignment of beneficiaries to each signatory operator was made on the basis of the Coal Act's determination of the operator most responsible for the beneficiaries' benefits. The Coal Act required that the Social Security Commissioner assign all beneficiaries to signatory operators according to a three-tiered statutory scheme. *Id.* § 9706(a). That scheme provided that coal miner retirees be assigned first to the operator who signed the 1978 NBCWA or later agreement and who was the most recent operator to have employed the re-

tiree *for at least two years. Id.* § 9706(a)(1). If no operator fit that description for a given retiree, the retiree was assigned to the operator who signed the 1978 NBCWA or later agreement and was the most recent signatory operator to have employed the retiree, *regardless of the length of employment. Id.* § 9706(a)(2). And if no operator fit that description, the retiree was assigned to the signatory operator who employed the retiree for the longest period of time. *Id.* § 9706(a)(3). The statute provided benefits for "unassigned" beneficiaries under a separate system. *Id.* § 9704(d).

To administer the Combined Fund, the Coal Act assigned responsibilities to the Secretary of the Treasury, the Commissioner of Social Security, and the Board of Trustees of the Combined Fund. The Commissioner was given the responsibility of assigning the beneficiaries to signatory operators according to the scheme established in § 9706(a) and of calculating the premium that each operator was to be assessed under the formulation provided in the statute. *Id.* §§ 9704, 9706. If a signatory operator were to fail to pay the premiums assessed, the Trustees of the Combined Fund could report that fact to the Secretary of Treasury, who was given the responsibility of determining whether there was reasonable cause for the failure to pay. *Id.* § 9707. The Board of Trustees of the Combined Fund was given the responsibility of administering the Fund, by collecting the premiums, *id.* § 9704(a); enrolling beneficiaries in health plans that fulfilled the statute's requirements, *id.* § 9703(b)(1); negotiating with health plans for payment rates, *id.* § 9703(b)(2); and

suing signatory operators for nonpayment, *id.* § 9721; 29 U.S.C. § 1451.

Congress designated the Combined Fund a "plan" under both the Labor Management Relations Act and ERISA. 26 U.S.C. § 9702(a)(3).

### C

The Pittston Company is a coal operator that was a signatory to the 1974 NBCWA, but to no subsequent agreements. The company does, however, have nine subsidiaries,[1] which are "related parties" under the Coal Act. At least one of the Pittston Company's subsidiaries signed a NBCWA after 1974. As a signatory operator, Pittston is responsible under the Coal Act for providing the healthcare benefits for active and retired coal miners.

Following the Supreme Court's decision in *Eastern Enterprises v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), which invalidated the application of the Coal Act to plaintiff Eastern because Eastern had quit the coal business and had not signed a wage agreement since 1964, the Social Security Commissioner reevaluated its assignments under 26 U.S.C. § 9706(a). The Commissioner determined that, in light of *Eastern Enterprises,* coal operators that had not signed the 1974 NBCWA or a later agreement were not to be assigned beneficiaries under the third prong of § 9706(a). Instead, each beneficiary would be assigned to a coal operator that had signed the 1974 NBCWA or a later agreement and that had employed the beneficiary for the longest amount of time. As a result of this reevaluation and interpretation of the Coal Act, the Commissioner reassigned to the Pittston Com-

---

1. The subsidiaries are Buffalo Mining Company, Clinchfield Coal Company, Eastern Coal Corporation, Elkay Mining Company, Jewell Ridge Coal Corporation, Kentland–Elkhorn Coal Corporation, Meadow River Coal Company, Pittston Coal Group, Inc., and Ranger Fuel Corporation.

pany 95 beneficiaries whose earlier assignments had been invalidated.

The Pittston Company and its subsidiaries (collectively, "Pittston") commenced this action in 1997, before the decision in *Eastern Enterprises,* alleging (1) that the Coal Act was unconstitutional as violating the nondelegation doctrine, and (2) that the United States had over-charged Pittston under the Coal Act in its assessments made over a period of three years. While the case was pending, the Supreme Court decided *Eastern Enterprises* and invalidated the application of the Coal Act to Eastern because the assignments of beneficiaries to Eastern created a severe retroactive liability that violated the Fifth Amendment. Pittston accordingly filed a motion for leave to amend its complaint to add a Fifth Amendment claim and also to claim that the Coal Act was not severable and therefore invalid as to Pittston under the ruling of *Eastern Enterprises.* The district court denied Pittston's motion to amend and also dismissed Pittston's pending constitutional claims as barred by the doctrine of *res judicata.* The district court, however, granted judgment for Pittston on the overpayment claim, a claim that the parties settled after the United States noticed an appeal.

On Pittston's appeal, we concluded that Pittston's claims were not barred by *res judicata* and that the district court improperly denied Pittston leave to amend its complaint. *Pittston Co. v. United States,* 199 F.3d 694, 706 (4th Cir.1999).

On remand, Pittston filed an amended complaint adding claims that the Coal Act is nonseverable and that it violates the Fifth Amendment as applied to Pittston, based on *Eastern Enterprises.* On motions for summary judgment, the district court resolved all substantive claims against Pittston.

These appeals followed.

## II

Pittston contends first that the Coal Act unconstitutionally delegates governmental authority to the Combined Fund, a private entity, giving the Combined Fund "discretionary authority to collect and spend federal taxes and the plenary authority to administer a federal entitlement." It asserts that under the constitutional structure, "[t]he President—not Congress, not the Judiciary, and certainly not a private party—is the person vested with executive power and charged with the right and duty faithfully to execute the nation's laws." In particular, Pittston argues that the Combined Fund is "unique" in that there is no entity under federal or state law like it because it is a private entity given the power "to collect, manage, and spend federal revenues." Pittston then lists some 21 powers given to the Combined Fund that it maintains involve an unconstitutional delegation, concluding at bottom that the Coal Act authorizes a" 'delegation in its most obnoxious form' " (quoting *Carter v. Carter Coal Co.,* 298 U.S. 238, 311, 56 S.Ct. 855, 80 L.Ed. 1160 (1936)).

The United States and the Trustees of the Combined Fund contend that the Coal Act specifies "in detail" how coal operators are identified for responsibility under the Coal Act; how assignments of retired coal miners to operators are made; how coal miners are identified; and the type of benefits each is to receive. They assert that the Act lawfully delegates to the Commissioner of Social Security the responsibility for calculating premiums assessed against coal operators, for making assignment of retirees to coal companies, for hearing challenges to the assignments, and for reviewing and revising them. They conclude: "The Act permits the Combined Fund and the Trustees to exercise only

limited responsibilities on a strictly circumscribed basis, and all of those responsibilities are ones that are traditionally exercised by private parties."

 It is a fundamental principle of jurisprudence that an agent has no authority to delegate his power to represent the principal except as authorized or as necessary and proper for the agent to perform his duties. Thus, when the Constitution vests "all legislative Powers" in a Congress of the United States, "the executive Power" in a President of the United States, and "the judicial Power" in one Supreme Court and such courts as Congress may establish, see U.S. Const. art. I, § 1; id. art. II, § 1; id. art. III, § 1, a nondelegation principle serves both to separate powers as specified in the Constitution, see, e.g., Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 472, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001), and to retain power in the governmental Departments so that delegation does not frustrate the constitutional design, see Carter, 298 U.S. at 311, 56 S.Ct. 855. Moreover, because the Constitution's text "permits no delegation of those powers," see Whitman, 531 U.S. at 472, 121 S.Ct. 903, in exercising conferred powers, a Department may authorize a person or body to act on its behalf only by designating " 'an intelligible principle to which the person or body authorized to act is directed to conform.' " Id. (quoting J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed. 624 (1928)). In other words, core governmental power must be exercised by the Department on which it is conferred and must not be delegated to others in a manner that frustrates the constitutional design.

 Because the Combined Fund in this case is a private entity, rather than a part of the executive branch of government, improper delegation of power to it would represent "legislative delegation in its most obnoxious form." Carter, 298 U.S. at 311, 56 S.Ct. 855. Any delegation of regulatory authority "to private persons whose interests may be and often are adverse to the interests of others in the same business" is disfavored. Id. In Carter, the Supreme Court invalidated the Bituminous Coal Conservation Act, which provided that all coal producers had to accept the maximum labor hours and minimum wages negotiated by majority producers of coal and representatives of more than half of the mine workers. The Court found that the law improperly delegated governmental power to the majority, enabling it to "regulate the affairs of an unwilling minority" and thus allowing controlling producers to pursue their interests unfairly. Id.

Not every Congressional delegation of authority to a private party is impermissible, however. In Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940), the Supreme Court upheld a statute that allowed a private party, made up of coal producers, to propose minimum coal prices to the National Bituminous Coal Commission, a public agency, which could then approve, disapprove, or modify the proposal. The Court found that because "members of the [private entity] function[ed] subordinately to the Commission," which had "authority and surveillance" over the private entity, the delegation was not unlawful. Id. at 399, 60 S.Ct. 907.

The Third Circuit applied Sunshine Anthracite to uphold the Beef Promotion Act, which created the Cattlemen's Board, a private entity, to collect from cattle producers an assessment of one dollar per head. United States v. Frame, 885 F.2d 1119 (3d Cir.1989), cert. denied, 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1070 (1990). Under the Beef Promotion Act, the Cattlemen's Board was authorized to

use the money collected to develop a beef-promotion plan, which was then subject to the approval of the Secretary of Agriculture. The Third Circuit found that because the private entity served "an advisory function, and in the case of collection of assessments, a ministerial one," the Act did not improperly delegate governmental power to a private entity. *Id.* at 1129. Thus, in applying the holding of *Sunshine Anthracite* and *Carter,* the Third Circuit articulated the standard that Congress may employ private entities for *ministerial* or *advisory* roles, but it may not give these entities governmental power over others. We agree that this articulation accurately summarizes the Supreme Court's holdings, and it is this standard that we now apply in assessing the provisions of the Coal Act to determine whether it improperly delegates core governmental power to the Combined Fund.

The Coal Act creates the Combined Fund to provide benefits to retired coal miners. 26 U.S.C. § 9702. The Act finances those benefits by annual assessments on "signatory operators," defined by the Coal Act to be any coal operator that has signed an agreement with the UMWA requiring the coal operator to pay for health and death benefits for retired miners. *Id.* § 9701(b)(1), (c)(1); *id.* § 9706(a). The Coal Act provides that any signatory coal operator still in business, whether or not in the coal business, remains liable for payment of premiums. *Id.* § 9701(c)(7); *id.* § 9706(a). And the Act sets out specific formulas for calculating the premiums to be paid by each signatory operator. *Id.* § 9704. It provides that the health benefit premium must be the "product of the per beneficiary premium for [each] plan year multiplied by the number of eligible beneficiaries assigned to such operator under section 9706." *Id.* § 9704(b)(1). And the Act assigns to the Social Security Commissioner the task of performing the specific

calculations. *Id.* § 9704(b)(2). Thus, the Combined Fund has no power to determine the premium payments owed by each coal operator to the Combined Fund.

Under this calculation of the health benefit premium, of course, the "number of eligible beneficiaries" assigned to a signatory operator ultimately fixes the amount that an operator must pay. The Social Security Commissioner, rather than the Combined Fund, is given the responsibility of assigning beneficiaries to the coal operators that will pay their benefits, according to a three-tiered preference structure explicitly set forth in the Act. *Id.* § 9706(a). The Commissioner is also given the responsibility of notifying each coal operator of its assignment of responsibility for each retired miner, *id.* § 9706(e)(2), and an assignee may seek administrative review of the Commissioner's decision if it believes that the assignment was in error, *id.* § 9706(f).

Finally, the Coal Act defines the scope of benefits that the Combined Fund must provide to beneficiaries, stating that they must be "substantially the same as (and subject to the same limitations of) coverage provided under the 1950 [NBCWA] and the 1974 [NBCWA] as of January 1, 1992." *Id.* § 9703(b)(1). A similar requirement is imposed on the death benefits provided by the Plan. *See* § 9703(c).Against these detailed requirements of the Coal Act, the Trustees of the Combined Fund are assigned the task of collecting the premiums *designated* by the statute from the persons *specified* by statute. The Trustees are directed to preserve the assets through investment and to pay them out as benefits to the beneficiaries in an amount *specified* by the statute. *Id.* § 9703(a)-(c). If a coal operator fails to pay the premium required by the Coal Act, it becomes liable to a $100–per–day penalty, and the Secretary of Treasury,

not the Combined Fund, determines whether the penalty may be excused. *Id.* § 9707.

In short, the Coal Act or the Social Security Commissioner defines the nature of the Combined Fund and who must contribute to it; specifies the amount of each premium payable by a coal operator to the Combined Fund; specifies with particularity each beneficiary who is entitled to receive benefits from the Combined Fund; and designates the nature and amount of the benefits. With those functions specifically defined and mandated by Congress, the Coal Act confers responsibility to the Trustees of the Combined Fund to implement the collection of the premiums, the preservation of premiums collected, and the payment of the premiums to specified beneficiaries in an amount stated by the Act. These powers given to the Trustees are of an administrative or advisory nature, and delegation of them to the Trustees does not, we conclude, violate the nondelegation doctrine.

Despite the reservation to Congress or the Commissioner of the core governmental powers with respect to the Combined Fund, Pittston has generated a 21–item list of powers that it claims were unconstitutionally delegated to the Combined Fund under the Coal Act.[2] (Text continued on page 20) The vast majority of these items clearly do not violate the nondelegation doctrine. *First,* several of them relate to the Combined Fund's internal governance, which in no way impinges upon others. These include creating and amending its own charter, employing staff and outside counsel, and enacting rules and regulations governing its operations. *Second,* several

---

2. Pittston characterizes the 21 powers of the Combined Fund as follows:

(1) It has the power to create its own charter—the trust document.

(2) It has the power to amend its charter at any time.

(3) It has the power to receive transfers of federal revenues directly from the United States Abandoned Mine Reclamation Fund.

(4) It has the power to collect taxes from assigned operators.

(5) It has the power to invest the money it receives, including placing the money with foreign banks and governments.

(6) If a taxpayer does not pay voluntarily, it has the authority to refer the taxpayer to the Treasury Department for imposition of a $100 per day per beneficiary penalty.

(7) It has the power to sue the taxpayer for the taxes owed.

(8) It has the power to compromise with the taxpayer on the principal amount owed, as well as interest, costs, and attorney's fees.

(9) It has the power not to sue a delinquent taxpayer if it so chooses.

(10) It decides whether taxpayers are still "in business" and thus subject to the Coal Act.

(11) It has the power to determine and sue "related persons" of the taxpayer.

(12) It has the power to "pierce the veil" of corporations and sue individuals.

(13) It has the power to employ staff under such terms as it chooses.

(14) It has the power to employ outside counsel.

(15) It has the power to contest in court the amount of the per beneficiary premium calculated by the Commissioner (and has done so).

(16) It has the power to enact rules and regulations governing its operations.

(17) It has the power to decide issues of eligibility under the definitions of the Coal Act.

(18) It has (or at least claims) the power to interpret the "intent of Congress" in enacting the Coal Act.

(19) It has (or at least claims) the power to decide whether to issue refunds or credits to taxpayers for overpayments.

(20) It has the power to calculate and assess death benefit premiums and unassigned beneficiary premiums. (21) It has the power to do all other acts that, in its opinion, are necessary to carry out the business of the Combined Fund.

relate to the power to sue for monies owed to itself, which is not a governmental power, but a private one. *Third,* the mere ability to receive governmental monies is clearly ministerial, so that the power to receive taxes (premiums) and other federal revenues (which private employers do with every paycheck) does not violate the nondelegation doctrine. *Fourth,* the Fund's authority to refer delinquent operators to the Treasury Department for a penalty is just an "advisory" role, subject to the Secretary of Treasury's supervisory authority, similar to that specifically authorized in *Sunshine Anthracite* as a valid delegation to a private entity. *Fifth,* the Combined Fund's power to "calculate and assess" some premiums is inconsequential, given that the Coal Act gives detailed guidance as to what those premiums must be and by whom they must be paid. The Fund in these capacities is merely carrying out the ministerial task of doing calculations and collecting funds.

Several of Pittston's other allegations are too vague even to constitute a power on the part of the Combined Fund. Its claims that the Combined Fund has the power "to decide issues of eligibility under the definitions of the Coal Act" and "to interpret the 'intent of Congress' in enacting the Coal Act" do not alone allege impermissible delegation. Anyone can interpret the intent of Congress, of course. The question is in what context the Combined Fund's interpretations might have weight, and how much. The Coal Act does not grant the Combined Fund any authority in interpreting its provisions. Similarly, Pittston fails to explain what "issues of eligibility" the Combined Fund has power to decide. Again, the Coal Act does not appear to leave any issues of eligibility to the Combined Fund. Pittston's claim that the Fund has the power to "decide whether to issue refunds or credits to taxpayers for overpayments" is an erroneous charac-

terization. Indeed, in this very litigation, Pittston sued the Combined Fund and received a judgment for its overpayment of Coal Act premiums as determined *by the provisions of the Coal Act.*

■ Pittston also challenges the Combined Fund's power to invest the premiums it receives from the coal operators. The function of investing money, however, is not essentially governmental in nature. The Combined Fund's activities in this regard are no different from those of many pension funds after the enactment of the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381—1461. The MPPAA was enacted to supplement ERISA and to establish the Pension Benefit Guaranty Corporation to administer an insurance program for vested benefits. Under the MPPAA, private pension funds receive withdrawal penalties that are assessed according to statute, and these private pension funds use the withdrawal-penalty payments to make investments and to pay pension fund beneficiaries. *See Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 723–25, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). While the Supreme Court has not decided explicitly that the MPPAA is permissible under the nondelegation doctrine, it has upheld the constitutionality of the Act against challenges under the Takings Clause and the Due Process Clause. *See id.* at 734, 104 S.Ct. 2709; *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 641, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 227–28, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). Pittston argues that the Combined Fund's activities are different from those of private pension funds under the MPPAA because the monies used by the Combined Fund have been defined as taxes. *See Pittston Co. v. Unit-*

*ed States,* 199 F.3d 694, 702 (4th Cir.1999). Regardless of how the monies are labeled, however, both the monies received by the pension funds under the MPPAA and the monies received by the Combined Fund under the Coal Act are assessed by statute. More to the point, the central inquiry is whether the *function* of the Combined Fund in preserving and investing money assessed by statute is governmental in nature. The label placed on the monies received by the Fund does not change the Fund's function. Moreover, the act of investing the money received under the Coal Act does not impinge upon the interests of other citizens in a way feared by the Supreme Court in *Carter.*

At its core, the Coal Act identifies each coal operator responsible for the payment of premiums and each coal miner who is to receive a benefit from the premiums. The Act determines the nature of the retiree's benefit and its amount, and the Social Security Commissioner, not the Combined Fund, computes the amount of the premium payable by a coal company for this purpose, based on the number of retirees assigned to the coal operator and the benefits payable to them. In this scheme, the Coal Act, in essence, leaves to the private entity only the administrative tasks of collecting the premiums, preserving them for the benefit of the beneficiaries, and using them to provide the beneficiaries with the benefits specified by the Coal Act.

Even with respect to the ministerial and advisory functions delegated to the Combined Fund, the Coal Act imposes restrictions by designating the Fund as a "plan" under the Labor Management Relations Act and the Employee Retirement Income Security Act ("ERISA"). *See* 26 U.S.C. § 9702(a)(3). Among other requirements, ERISA provides that an ERISA plan's trustees must act "solely in the interest of the participants and beneficiaries and . . .

for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan. . . ." 29 U.S.C. § 1104(a)(1). As characterized by the Supreme Court, ERISA imposes " 'strict fiduciary obligations on those who have discretion or responsibility respecting the management, handling, or disposition of pension or welfare plan assets.' " *Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 141 n. 8, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) (quoting 120 Cong. Rec. 29, 932 (1974)). Their failure to discharge their specified duties properly subjects them to the threat of personal lawsuits for breach of fiduciary duty. The Combined Fund Trustees are thus subject to many restrictions ensuring that even in discharging administrative and advisory powers, they not act according to their own whims or prejudices, but *solely* in the best interest of the Combined Fund's beneficiaries.

In sum, the Trustees' powers with respect to the Combined Fund are far from unfettered. The Trustees are not able to use their position for their own advantage—to the disadvantage of their fellow citizens—as was permitted by the Bituminous Coal Conservation Act struck down in *Carter.* They are given ministerial and advisory tasks in a manner and to an extent that does not violate the nondelegation doctrine.

### III

Pittston next contends that the Supreme Court's decision in *Eastern Enterprises,* 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451, invalidating the Coal Act's application to a group of coal operators, had the effect of invalidating the entire Coal Act, because the decision so altered the Act that to continue to enforce it would contradict congressional intent. Pittston argues that to make up for the shortfall effected by the

holding in *Eastern Enterprises* and its elimination of a group of coal operators as contributors to the Combined Fund, the Trustees assigned retired coal miners to Pittston and others, requiring them "to pay more because others are paying less." Pittston notes that the Coal Act was a "bipartisan compromise," the "key feature [of which] was the imposition of liability on *all* former signatories to NBCWAs." For these reasons, Pittston argues that no part of the Coal Act is severable from the parts deemed unconstitutional, and therefore the entire Act is unenforceable.

The Coal Act directs the Commissioner of Social Security to assign to each coal operator the duty of paying premiums to fund the benefits of each retired coal miner whom it employed and for whom it had the most responsibility. The assignments are made in accordance with a detailed, three-tiered system designed to match up beneficiaries with the coal operators deemed most responsible for providing the retirees' benefits. Thus, a retiree is assigned first to any operator who signed the 1978 NBCWA and who was the most recent operator to employ the retired miner for at least two years. 26 U.S.C. § 9706(a)(1). If no such operator exists, the retiree is assigned to a coal operator who signed the 1978 NBCWA and who was the most recent employer of the coal miner, regardless of his length of service. *Id.* § 9706(a)(2). Finally, if no such operator exists, the Coal Act provides that the beneficiary is assigned to the operator who employed the retired coal miner the greatest length of time, regardless of which NBCWA the operator has signed. *See id.* § 9706(a)(3).

In *Eastern Enterprises,* the Supreme Court held this assignment scheme unconstitutional as it applied to the plaintiff Eastern. Eastern had conducted business as a coal operator from 1929 to 1965, and even though it was a signatory to each NBCWA between 1947 and 1964, it signed none after the 1964 NBCWA. Under the assignment scheme of the Coal Act, Eastern was assigned more than 1000 retired coal miners who had worked for the company before 1966 and who had not worked for any coal operator that had signed the 1978 NBCWA or later agreement. *See* 26 U.S.C. § 9706(a)(3). Because of those assignments, Eastern was retroactively assessed more than $5 million in premiums to pay for benefits of employees who had worked for it some 35 years earlier and for whom Eastern had never signed a NBCWA promising lifetime healthcare benefits. The plurality in *Eastern Enterprises* identified the 1974 NBCWA, one that Eastern did not sign, as the one in which lifetime benefits were first promised. *See* 524 U.S. at 509, 530, 535, 118 S.Ct. 2131.

The majority of the Supreme Court found the application of the Coal Act to Eastern unconstitutional because it imposed severe retroactive liability on the company. The plurality of the Court held that the assignment of beneficiaries to Eastern worked an unconstitutional taking, reasoning that Eastern was being forced "to bear a burden that is substantial in amount, based on . . . conduct far in the past, and unrelated to any commitment that [Eastern] made or to any injury [it] caused." *Eastern Enterprises,* 524 U.S. at 537, 118 S.Ct. 2131 (O'Connor, J.). Justice Kennedy, concurring in the judgment, found that the statute's application to Eastern violated substantive due process, reasoning that because Eastern left the coal business long ago and was not a party to any agreements that contemplated lifetime benefits, "[t]his case is far outside the bounds of retroactivity permissible under our law." *Id.* at 550, 118 S.Ct. 2131 (Kennedy, J., concurring in the judgment and dissenting in part).

The question Pittston thus presents is whether the Supreme Court's holding that the Coal Act was unconstitutional, as it applied to Eastern, in effect invalidated the Coal Act for all coal operators because the Act is not severable.

■ We begin with the background presumption that when an application of a statute is determined to be unconstitutional, courts seek to preserve as much of the statute as is still consistent with legislative intent; courts "should refrain from invalidating more of the statute than is necessary.... [W]henever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid." *Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 107 S.Ct. 1476, 94 L.Ed.2d 661, 684 (1987) (internal quotation marks and citations omitted). The question of whether portions of an act can be severed from unconstitutional portions requires "an inquiry into legislative intent." *Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 191, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999). Thus, valid provisions of an act will remain enforceable unless it is "evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not." *Alaska Airlines,* 480 U.S. at 684, 107 S.Ct. 1476 (internal quotation marks and citations omitted). Of course, an explicit severability clause within a statute "creates a presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision. In such a case, unless there is *strong evidence* that Congress intended otherwise, the objectionable provision can be excised from the remainder of the statute." *Id.* at 686, 107 S.Ct. 1476 (citations omitted) (emphasis added).

■ The Coal Act is subject to a severability clause that provides, "If any provision of this title, or the application thereof to any person or circumstances, is held invalid, the remainder of the title, and the application of such provision to other persons or circumstances, shall not be affected thereby." 26 U.S.C. § 7852(a). Because Congress revealed its intent to make the provisions of Title 26 severable, Pittston must present "strong evidence" that Congress would never have intended to enact the Coal Act's assignment scheme at all if it could not have included Eastern-like operators.

Pittston argues that the strong evidence of Congress' intent that the Coal Act not be severable when some coal operators—such as Eastern-like operators—are removed from the funding pool is supplied by (1) legislative history, and (2) the altered functioning of the Act without Eastern-like operators included in the pool.

In support of its legislative-history argument, Pittston points only to a statement by Senator Rockefeller that "[i]nstead of including a broad industrywide tax, the basic funding mechanism of this legislation generally requires premium payments *from those for whom the retirees worked.*" (Quoting 138 Cong. Rec. S 17,633 (daily ed. Oct. 8, 1992) (Statement of Sen. Rockefeller)) (emphasis added). This statement, however, does not suggest that it was an essential aspect of the Coal Act that *every* coal operator be an actual contributor to the Combined Fund. The most that can be drawn from it is that coal operators will be assessed premiums only for those retired coal miners they actually employed. Thus, even if we were permitted to consider this statement from the legislative history as binding, it would not advance Pittston's cause. When Eastern-like operators are excluded from operation of the Coal Act, the reassignments of remaining retired

miners are made under 26 U.S.C. § 9706(a) only to coal operators who *actually employed the retired miners.* This is just what Senator Rockefeller said: that the functioning of the Coal Act "generally requires premium payment from those for whom the retirees worked."

More importantly, Pittston's assertion that the Coal Act's functioning was dependent on the imposition of liability "on *all* former signatories to NBCWAs" is belied by the very terms of the Act. Anticipating that not *all* coal operator signatories will be available for the assignment of retired coal miners, the Act provides procedures for when companies go out of business and no longer contribute to the Combined Fund. *See* 26 U.S.C. §§ 9706(a), 9701(c)(7), 9704(f)(2)(B). In such circumstances, the orphaned beneficiaries are supported by the remaining companies. These provisions conclusively indicate that Congress did not intend the Coal Act to cease in force simply because some operators who were initially intended to be included in the statutory scheme had dropped out.

Furthermore, after the decision was handed down in *Eastern Enterprises* and after it became clear that Eastern-like operators could not be included in the Coal Act's assignment scheme, Congress continued to make appropriations to benefit Coal Act funds. *See* Consolidated Appropriations Act of 2000, Pub.L. No. 106–113, § 501, 113 stat. 1501, 1501A–214 (1999); Dept. of the Interior and Related Agencies Appropriations Act of 2001, Pub.L. No. 106–291, § 701, 114 stat. 922, 1024 (2000). These appropriations *after Eastern Enterprises* suggest that Congress would have intended that the constitutional applications of the Coal Act continue to survive after *Eastern Enterprises.* Although these appropriations were by a later Congress, they carry weight in construing the intent of Congress in enacting the Coal Act. *Cf. Loving v. United States,* 517 U.S. 748, 770, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996).

Pittston also argues that if Eastern-like operators are not included as contributors, the Coal Act is "incapable of functioning independently," which would be dispositive evidence that Congress would not have enacted it without the inclusion of these operators. *See Alaska Airlines,* 480 U.S. at 684, 107 S.Ct. 1476. But Pittston's assertion that the Coal Act is "incapable of functioning independently" is belied by the fact that the Coal Act continues to function without Eastern-like operators and has so functioned since 1998, when the *Eastern Enterprises* decision was handed down. The third-tier group under the assignment scheme in § 9706(a) has merely ceased to include Eastern-like operators. Moreover, even if beneficiaries assigned to Eastern-like operators could not be assigned to any other operators in accordance with the provisions of § 9706(a), the Act contemplates providing benefits to such "unassigned" beneficiaries. 26 U.S.C. § 9704(d).

In sum, Congress intended the Coal Act to be severable by inclusion of a severability clause, and the Act remains fully functional without including Eastern-like coal operators. There is no evidence to overcome the presumption that the Coal Act should continue in force despite the Supreme Court's decision in *Eastern Enterprises.*

## IV

Pittston also contends that the Social Security Commissioner improperly interpreted and applied the Coal Act in the wake of *Eastern Enterprises* when she reassigned retirees previously assigned to Eastern-like operators. In making those reassignments, the Commissioner interpreted *Eastern Enterprises* to invalidate

any assignments made under 26 U.S.C. § 9706(a)(3) to coal operators that never signed the 1974 NBCWA or later agreements. According to Pittston, the number of assignments so invalidated was in the thousands. The Commissioner then reassigned these retirees to the coal operator that had signed the 1974 NBCWA or a later agreement and that employed the retiree for the longest amount of time. As a result of this reassignment, Pittston, as a signatory to the 1974 NBCWA or (through related companies) to a later agreement, received 95 more beneficiaries than it had prior to the Supreme Court's decision in *Eastern Enterprises.* Pittston contends that the Commissioner's construction of the Coal Act to make these reassignments violated the explicit provisions of § 9706(a) (establishing the priority scheme for assigning retirees to coal operators) and § 7852(a) (the severability clause for Title 26 of the United States Code).

It is true that Congress did not state explicitly in the Coal Act what the Commissioner should do if assignments to specific coal operators were deemed unconstitutional. But without specific instructions, in light of *Eastern Enterprises,* the Commissioner removed Eastern-like coal companies from the pool of qualified signatory operators and reassigned their beneficiaries to other companies, applying the provisions of § 9706(a) to this smaller pool of operators. Because Congress provided no explicit instructions, the question presented is whether the Commissioner's reassignments under § 9706(a) are "based on a permissible construction of the statute." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The provision of the Coal Act on which the Commissioner based her construction, § 9706(a), provides the method of assigning retirees to signatory coal operators:

For purposes of this chapter, the Commissioner of Social Security shall, before October 1, 1993, assign each coal industry retiree who is an eligible beneficiary to a signatory operator which (or any related person with respect to which) remains in business in the following order:

(1) First, to the signatory operator which—

(A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry for at least 2 years.

(2) Second, if the retiree is not assigned under paragraph (1), to the signatory operator which—

(A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry. (3) Third, if the retiree is not assigned under paragraph (1) or (2), to the signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement.

26 U.S.C. § 9706(a).

With respect to its argument that the Commissioner misconstrued and misapplied § 9706(a), Pittston asserts that the 95 retirees reassigned to it were properly assigned in the first place to Eastern-like coal operators under the terms of § 9706(a), and because they were properly assigned to other coal operators, they could not later be properly assigned to Pittston. Pittston explains:

The fact that the assignments [made to Eastern-like coal operators] proved to

be unconstitutional does not mean that they were not made as the statute requires. In *Eastern,* the Supreme Court held that the assignments required by the statute were unconstitutional, not that the assignments were contrary to the statute. The Government and Trustees want to revise the statutory order and make the remaining operators like Pittston pay for people who should be— and were—assigned to other operators.

In short, Pittston argues that the Commissioner had no authority to take beneficiaries away from Eastern-like companies and reassign them to Pittston as the "next-in-line" coal operator.

Pittston is wrong, however, in asserting that the assignments originally made to Eastern-like companies were proper—that beneficiaries ever "should" have been assigned to Eastern and to other Eastern-like signatories. In so arguing, Pittston misconstrues the nature and effect of *Eastern Enterprises.* When *Eastern Enterprises* held that it was unconstitutional to assign retirees to Eastern under the Coal Act, the ruling effectively held that the Commissioner *should never have assigned* retirees to Eastern *in the first place.* Because the Commissioner's assignments were invalid from the beginning, she had to start over to assign the beneficiaries to comport with the terms of the statute as well as the Constitution. Thus, contrary to Pittston's suggestion

that the Commissioner merely reassigned retirees to the "next-in-line" operator, after *Eastern Enterprises* the Commissioner in fact interpreted "signatory operators," as used in the Coal Act and in light of the requirements of the Constitution, to include *only* operators that had signed a 1974 NBCWA or later agreement. She then assigned each retiree whose assignment was declared invalid to the signatory operator that had employed the retiree the *longest*—exactly as she was instructed to do by § 9706(a)(3) of the Coal Act. Had the Commissioner merely moved these retirees to the "next-in-line" operator, as Pittston supposes, the Commissioner would occasionally have ended up with yet another Eastern-like operator, and moreover would have acted inconsistently with her statutory responsibility to identify the signatory operator that employed the beneficiary the longest.

When a retiree cannot be assigned under § 9706(a)(1) or § 9706(a)(2), the Coal Act sometimes directs the Commissioner to do something unconstitutional: i.e., assign the retiree to an Eastern-like coal operator. In drafting the Coal Act, Congress did not contemplate that some members of the "signatory operators" group could not constitutionally be required to contribute to the Combined Fund. The situation faced by the Commissioner was thus the kind of "case unprovided for" that allows her to engage in gap-filling.[3] *See*

---

**3.** The dissent argues that this was *not* a "case unprovided for," in the sense that the statute provides for "unassigned" beneficiaries. It argues:

In the case of each of the 95 retirees at issue here, the plain language of § 9706(a) at the time the original assignments were made identified a single company—an *Eastern*-type company. However, because assignments to these companies were unconstitutional, the Commissioner could not lawfully perform the only act authorized by § 9706(a).... The statute provides unambiguous instructions for

the Commissioner to follow with respect to retirees who are not assigned under § 9706(a): They must remain unassigned. Thus, there is no gap for the Commissioner to fill.

This argument fails for two reasons.

*First,* it fails to take into account the retroactivity of the holding in *Eastern Enterprises.* Even though *Eastern Enterprises* was decided six years after enactment of the Coal Act, it had the effect of disqualifying *ab initio* Eastern-like companies from the pool to whom

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 169, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003). In applying § 9706 to the retirees left unassigned as the result of the decision in *Eastern Enterprises*, the Commissioner has not violated or disturbed the structure of the Coal Act. She merely removed from the pool of possible contributors those coal operators that could not constitutionally be required to contribute. Among the remaining contributors, she followed the Coal Act's assignment structure to the letter. In short, in making reassignments, the Commissioner did not change the wording of the statute, but merely followed the Supreme Court's ruling that the Coal Act may only apply to a narrower group of persons than previously thought.

In finding that the Commissioner has permissibly interpreted the Coal Act in the

---

the Commissioner could assign retirees. The dissent's statement that the Coal Act "identified a single company—an *Eastern* -type company"—to whom to assign the 95 retirees at issue is literally true, but it is incomplete in that it fails to address how the assignment pool was to be determined when Eastern-like companies were disqualified *as of the time the original assignments were made.* Because *Eastern Enterprises* retroactively disqualified Eastern-like companies from assignments under the Coal Act, the Commissioner looked at the defined pool of qualified signatories as if it were 1992, when the Coal Act was enacted. She reasoned that inasmuch as Congress intended to include in the pool only those companies then "in business," *see* 26 U.S.C. § 9706(a) (providing that retirees may be assigned only to a "signatory operator *which* ... remains in business "), she should take the small step of construing the class of out-of-business operators to include Eastern-like companies who were constitutionally disqualified. This gap-filling is, as we conclude, entitled to *Chevron* deference.

Thus, when assigning the 95 retirees to the pool adjusted by *Eastern Enterprises,* the Commissioner followed the provisions of § 9706(a) strictly, assigning each of the 95 retirees to the single signatory operator *then in the pool* who had employed the retiree the longest—in this case, Pittston. The retiree

---

wake of *Eastern Enterprises,* we have also considered the legislative intent expressed by Congress to minimize the number of unassigned beneficiaries by assigning each retiree to a coal operator most responsible for providing benefits. As the Supreme Court has observed:

> This much is certain: the Coal Act rests on Congress's stated finding that it was necessary to "identify persons most responsible for plan liabilities," and on its express desire to "provide for the continuation of a privately financed self-sufficient program for the delivery of health care benefits," Energy Policy Act of 1992, Pub.L. 102–486, § 19142, 106 Stat. 3037. In the words of Senator Wallop's report delivered shortly before enactment, the statute is "designed to allocate the greatest number of benefi-

---

would have remained "unassigned" *only* if the adjusted pool had not, as of the Coal Act's enactment, contained an operator who had employed the retiree. *See* 26 U.S.C. §§ 9706(a), 9704(d). Of course, if an operator went out of business *after* the Coal Act went into effect, its retirees would also become unassigned.

*Second,* the dissent's proposed solution to leave the 95 retirees unassigned *for constitutional reasons* finds no explicit basis in the text of § 9706(a) and therefore cannot reflect "unambiguous instructions" of Congress, as the dissent claims. Section 9706(a) leaves unassigned only those retirees who were *never* employed by a signatory operator that was "in business" at the enactment of the Coal Act. The 95 retirees at issue were employed by signatory operators who clearly fit the definition in § 9706(a), albeit Eastern-like companies. Therefore, the Act cannot have "unambiguously expressed" Congress' intent that they become "unassigned" under § 9704(d), as the dissent proposes. Left without explicit instructions as to how to apply *Eastern Enterprises,* the Commissioner filled the gap by deciding which operators qualified for the pool as of the time of enactment and then assigning each retiree to the *one* operator in the pool who employed the retiree the longest, as provided in § 9706(a).

ciaries in the Plans to a prior responsible operator. For this reason, definitions are intended by the drafters to be given broad interpretation to accomplish this goal." 138 Cong. Rec. 34001 (1992). *Barnhart v. Peabody Coal,* 537 U.S. at 171–72, 123 S.Ct. 748 (footnote omitted). The Commissioner's interpretation and application of § 9706 fulfills this legislative intent. She determined that, of all the signatory coal operators to whom assignments would be lawful, Pittston employed these 95 beneficiaries *the longest.* According to the rationale underlying the Coal Act's assignment structure, that makes Pittston the coal operator most responsible for providing benefits to those 95 beneficiaries.

With respect to Pittston's argument that the Commissioner's reassignment of retirees to Pittston violated 26 U.S.C. § 7853(a), the Internal Revenue Code's severability clause, Pittston contends that "the application of an internal revenue law to one person 'shall not be affected' by the invalidation of that law to another person. Yet that is exactly what the Government and Trustees have done to Pittston; they have made Pittston pay *more* because Eastern and other companies are paying *less.*" We conclude that this argument misconstrues § 7853(a).

The severability clause reads:

If any provision of this title, or the application thereof to any person or circumstances, is held invalid, the remainder of the title, and the application of such provision to other persons or circumstances, shall not be affected thereby.

26 U.S.C. § 7852(a). From a straightforward reading of this provision, we conclude that the clause merely provides that if a provision in Title 26 applied to one party before the provision was invalidated as to other parties, it will continue to apply to

that one party. It does not mean that the application of the provision to one party cannot result in changed *liabilities* after an invalidation as to other parties. Severing a statute's provisions will occasionally result in enhanced liabilities for some parties as a result of the remaining provisions. That result is not inconsistent with the idea that the *application* of the statute will not be affected as to those parties. Indeed, in accordance with § 7852(a), the Coal Act remains operative as to non-Eastern-like coal companies. Thus, even though the statute—as now applied to Pittston without Eastern-like companies in the contributing pool—may result in different liabilities, the fact and method of applying the Coal Act to Pittston have not changed.

In sum, we conclude that the Commissioner's application of 26 U.S.C. § 9706(a) in making 95 reassignments to Pittston following *Eastern Enterprises* was a permissible construction of the Coal Act.

V

■ Finally, Pittston contends that the Coal Act violates the Due Process Clause and Takings Clause of the Fifth Amendment. It argues that the last NBCWA that it signed was the 1974 NBCWA which, it contends, did not contemplate lifetime benefits for coal miners. According to Pittston, such lifetime benefits were first included in the 1978 NBCWA. Accordingly, it argues, applying the Coal Act to Pittston violates the Fifth Amendment.

Pittston acknowledges, however, that its subsidiaries—"related parties" under the Coal Act—did sign the 1978 NBCWA and later agreements, and, according to our precedent, the signatory status of one related party may be imputed to other related parties, making Pittston effectively a signatory to the 1978 NBCWA and later agreements. *See A.T. Massey Coal Co. v.*

*Massanari*, 305 F.3d 226 (4th Cir.2002). Pittston also acknowledges that *Massey Coal* requires us to reject Pittston's argument. In lieu of pressing the point further to this three-judge panel of the court, which is bound by *Massey*, Pittston urges us to hold this issue in abeyance until the Supreme Court decides whether to grant a petition for writ of certiorari in *Massey* or in *Berwind Corp. v. Comm'r*, 307 F.3d 222 (3d Cir.2002) (reaching the same conclusion as *Massey*).

The Supreme Court has, since Pittston filed its brief on appeal, denied the petitions for a writ of certiorari in both *Massey* and *Berwind*. *See Massey*, 538 U.S. 1012, 123 S.Ct. 1928, 155 L.Ed.2d 847 (2003); *Berwind*, 538 U.S. 1012, 123 S.Ct. 1927–28, 155 L.Ed.2d 848 (2003). Accordingly, its motion to hold this claim in abeyance has been rendered moot. And on the merits of its Fifth Amendment argument, we agree with Pittston that it is foreclosed by *Massey*.

## VI

■ In addition to its substantive contentions, Pittston argues that the district court abused its discretion in refusing to unseal documents that were sealed pursuant to a stipulated protective order.

During discovery, in order to facilitate the discovery of documents from the Bituminous Coal Operators' Association ("BCOA"), which is not a party to this case, counsel for both Pittston and BCOA agreed that certain categories of information produced in discovery would be protected from public disclosure. On October 22, 2001, the district court issued a stipulated protective order, which both parties signed, protecting from disclosure documents "denominated by the producing person ... as containing confidential, proprietary, commercial, or financial data." Operating under that protective order,

BCOA produced 295 pages of documents to Pittston, several of which were designated as protected under the Protective Order. Pittston used the protected documents in connection with its filings on motions for summary judgment, and then filed a motion to unseal the documents, which the district court denied.

In seeking to reverse the district court, Pittston claims that it is promoting the public interest in access to the documents, as was The Washington Post in *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 252–54 (4th Cir.1988)(holding that The Washington Post was entitled access to documents sealed by a protective order and used by the parties in summary judgment proceedings). Unlike the circumstances in *Rushford*, where The Washington Post did not have access to the documents, Pittston already had access to the documents covered by the protective order. Moreover, Pittston itself agreed to the sealing of the documents in order to benefit from a more open discovery from BCOA, which was not a party to the litigation.

In the circumstances, we conclude that the district court did not abuse its discretion.

## *AFFIRMED*

WILKINS, Chief Judge, concurring in part and dissenting in part.

Following *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) [hereinafter *"Eastern"*], it was apparent that assignments to companies similarly situated to Eastern ("*Eastern*-type assignments"), although made at Congress' direction in accordance with the Coal Act, were unconstitutional and thus should never have been made. However, in reviewing these assignments in light of *Eastern*, the Social Security Commissioner ("the Commissioner") not only revoked the unconstitutional assignments but also reassigned the affected retirees to other com-

panies such as Pittston. Because I believe these reassignments contravened the plain language of the Coal Act, I respectfully dissent in part from Part IV of the majority opinion. I concur in the remainder of the opinion.

Initially, it is important to recognize that with regard to each retiree, at the time of the Commissioner's review, 26 U.S.C.A. § 9706(a) (West 2002) either identifies a single company for assignment[ or does not authorize assignment at all. The Commissioner's narrow task with regard to each retiree is to determine whether § 9706(a) identifies a company to which the retiree can be assigned. If so, the assignment is made, and the company to which the retiree is assigned funds the retiree's benefits. *See id.* If not, the retiree's benefits are funded by all companies in proportion to the number of retirees they have been assigned. *See* 26 U.S.C.A. § 9704(d) (West 2002) (requiring operators to fund

benefits of eligible beneficiaries "who are not assigned under section 9706"); 26 U.S.C.A. § 9704(f)(1) (West 2002).

The question thus becomes how to apply *Eastern* retroactively to § 9706(a). In the case of each of the 95 retirees at issue here, the plain language of § 9706(a) at the time the original assignments were made identified a single company—an *Eastern*-type company.[1] However, because assignments to these companies were unconstitutional, the Commissioner could not lawfully perform the only act authorized by § 9706(a).

The majority concludes that the Commissioner's inability to perform this act leaves a gap in the statute. *See ante*, at 403–04 & n. 3. I disagree. The statute provides unambiguous instructions for the Commissioner to follow with respect to retirees who are not assigned under § 9706(a): They must remain unassigned.[2]

---

1. The majority contends that applying *Eastern* retroactively could somehow change which operator § 9706(a) identifies. *See ante*, at 403–04 n. 3. That is incorrect. In the case of each of the 95 retirees at issue here, *Eastern* only prevented *assignment* of the retiree to the single company that § 9706(a) identified. It did not somehow create an ambiguity regarding the identification of that company. In other words, the "signatory operator" remaining "in business" "which employed the ... retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement" is no different after *Eastern* than it was before. The majority reaches the opposite conclusion by reasoning that, under *Eastern*, the *Eastern*-type companies might reasonably be viewed as being no longer "in business," thereby leaving the door open to assignment to other, non*Eastern*-type companies. However, that interpretation of "in business" is plainly foreclosed by the definition Congress gave that term. *See* 26 U.S.C.A. § 9701(c)(7) (West 2002) (providing that company remains "in business" so long as it continues to "conduct[ ] or derive [ ] revenue from any business activity"); *infra* n.3.

2. The majority contends that my "proposed solution to leave the 95 retirees unassigned for constitutional reasons finds no explicit basis *in the text of § 9706(a)*." *Ante*, at 403–04 n. 3 (emphasis omitted). The majority similarly notes that Congress did not unambiguously express its intent to leave retirees unassigned when the plain language of § 9706(a) would require *Eastern*-type assignments. From these premises, the majority concludes that the Commissioner lacked explicit instructions regarding how to proceed with respect to the 95 retirees at issue here. *See id.* The majority's conclusion does not follow from its premises. The Commissioner's direction here comes not simply from the *text* of the Coal Act, but from the text read in light of *Eastern*. The text of the Coal Act unambiguously authorized the Commissioner to assign each of the 95 retirees at issue here to an *Eastern*-type company. And, *Eastern* negated that authority. Prohibited from making the only assignment that Congress had authorized, the Commissioner's work was complete. She had full directions—from the Coal Act and from the Constitution—and there was no gap left to fill. To be clear, that the Commissioner's assignments of these 95

Thus, there is no gap for the Commissioner to fill.

The majority reaches the opposite conclusion by effectively dividing the mandate of § 9706(a) into two distinct commands—a general requirement that the Commissioner assign each retiree to a signatory operator and a more specific set of instructions about how to select the appropriate operator for such an assignment. On this reading, there *is* a gap; the Commissioner must make an assignment but cannot adhere to Congress' directions about how to do this, and the Commissioner therefore must formulate her own assignment rules. In my view, however, this bifurcation of § 9706(a) misreads the statute. Congress plainly did not require that every retiree be assigned to a signatory operator whenever such an operator is available; for example, as the majority notes, if the operator to whom a retiree is originally assigned goes out of business, the retiree is not *re*assigned, but instead becomes *un*assigned, *see* 26 U.S.C.A. § 9704(f)(2)(B) (West 2002). Thus, the better reading of § 9706(a) is that Congress intended for the Commissioner to make assignments under that provision only when she can do so consistently with its plain language; if not, the Commissioner must leave the retiree unassigned rather than devise additional assignment rules.

Nevertheless, the Commissioner did not stop there. Unable to make the assignments that Congress actually authorized,

the Commissioner created a new assignment plan and assigned the 95 retirees at issue here to Pittston, a company that would not have been liable under the plan that Congress established.[3] This rewriting of the statute—without any authority from Congress—is impermissible. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) (explaining that "an agency literally has no power to act ... unless and until Congress confers power upon it"); *Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C.Cir. 2002) (emphasizing that a federal agency, as a "creature of statute," has "*only*" those authorities conferred upon it by Congress") (internal quotation marks omitted). As the Supreme Court stated in another case interpreting the Coal Act,"[o]ur role is to interpret the language of the statute enacted by Congress.... We will not alter the text in order to satisfy the policy preferences of the Commissioner." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461–62, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002).

The majority notes that allowing reassignment to companies like Pittston serves the purposes that Congress sought in enacting the Coal Act. *See* ante, at 403–05. With respect to the majority, even if it has correctly identified the *purposes* of the Coal Act, those purposes are irrelevant when the *language* of the Coal Act plainly

retirees to Pittston were unauthorized is not established by the *presence* of an unambiguous expression of Congressional intent to have the Commissioner leave retirees unassigned when the language of the Coal Act would require that they be assigned to *Eastern*-type companies. Rather, it is based on the *absence* of any authority to make any assignments other than those that Congress authorized.

3. The Commissioner's new assignment plan removed *Eastern*-type companies from the

pool of signatory operators to whom retirees could be assigned; thus, retirees who worked for such operators could be assigned to an operator who remained within that pool. But neither the definitions of "signatory operator," *see* 26 U.S.C.A. § 9701(c)(1) (West 2002), and "in business," *see id.* § 9701(c)(7), nor the assignments provision, *see id.* § 9706(a), provides for narrowing the pool in this manner.

provides no authority for the agency action. *See Barnhart*, 534 U.S. at 461–62, 122 S.Ct. 941. If Congress wanted the Commissioner after *Eastern* to be able to create a new assignment plan, it was incumbent on Congress to have provided the Commissioner with that authority. Because Congress did not do so, I would hold that the 95 reassignments to Pittston were *ultra vires* and that Pittston thus is entitled to a refund of the additional premiums it paid as a result of those reassignments.