**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1975**

MICHAEL JONES,

       Plaintiff – Appellant,

v.

LOWE'S COMPANIES, INC.,

       Defendant – Appellee.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Kenneth D. Bell, District Judge. (3:17-cv-00140-KDB-DSC)

Argued: December 10, 2020                     Decided: February 9, 2021

Before WILKINSON and FLOYD, Circuit Judges, and Gina M. GROH, Chief United States District Judge for the Northern District of West Virginia, sitting by designation.

Affirmed by unpublished opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Groh concurred. Judge Floyd wrote an opinion dissenting in part and concurring in part.

**ARGUED:** S. Luke Largess, TIN, FULTON, WALKER & OWEN, PLLC, Charlotte, North Carolina, for Appellant. Stuart Alan Raphael, HUNTON ANDREWS KURTH LLP, Washington, D.C., for Appellee. **ON BRIEF:** Cheyenne N. Chambers, TIN, FULTON, WALKER & OWEN, PLLC, Charlotte, North Carolina, for Appellant. A. Todd Brown, Sr., Charlotte, North Carolina, Holly Williamson, Houston, Texas, Trevor S. Cox, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

WILKINSON, Circuit Judge:

Appellant Michael Jones appeals the district court's grant of summary judgment on his discrimination and defamation claims against appellee Lowe's Companies, Inc. For the reasons that follow, we affirm.

## I.

## A.

In January 2013, Lowe's hired Jones, an African-American executive, to fill the role of Chief Merchandising Officer. J.A. 149. Greg Bridgeford, the Chief Customer Officer, initially selected Jones, but CEO and President Robert Niblock ultimately authorized and approved the hire. J.A. 1412. As Bridgeford later testified, there was an understanding at the outset that Jones would replace Bridgeford, who was planning to retire, as Chief Customer Officer. J.A. 442. Because of this expectation, Bridgeford testified that he wanted to make sure that CEO Niblock was comfortable with Jones. J.A. 442. Bridgeford also testified that Niblock showed no hesitation "at all" in approving the hire and that Niblock thought Jones' "upside" was "very strong." J.A. 442-44.

Things started off well. Over the following year, Jones received excellent performance reviews. For example, Bridgeford wrote in one performance review that "[i]n 30 years at Lowe's, I have never seen an 'outsider' come into the Lowe's culture" and have such a positive impact. J.A. 550. During that year, Bridgeford asked Niblock "[e]very month" how he thought Jones was doing and Niblock was "very positive," saying Jones "was hitting his mark." J.A. 442-44. Bridgeford and Niblock at "various times" discussed the prospect that Jones might ultimately succeed Niblock as CEO, sometime in the future.

3

J.A. 444. Niblock reacted "positive[ly]" to that idea, although Niblock himself never expressed any plans to retire. J.A. 444.

In February 2014, Jones was promoted to take Bridgeford's job as Chief Customer Officer. J.A. 625-26. Although Niblock did not discuss the promotion directly with Jones, Niblock and Bridgeford had been planning to make the move since Jones was hired and Niblock made the final promotion decision. J.A. 208–09. With his promotion, Jones now reported directly to CEO Niblock.

The relationship between Jones and Niblock started off amicably. Business was good for Lowe's in the few years following Jones' promotion. *See, e.g.*, J.A. 625, 637. Jones consistently received good performance reviews from Niblock. J.A. 648–54. Niblock advised the Board of Directors to make Jones his "hit-by-a-bus successor" as CEO, meaning Jones would lead the company if Niblock suddenly died, though the Board ultimately selected the General Counsel as the potential emergency replacement instead. J.A. 1706–07. In 2015, Niblock presented an internal succession document to the Board listing Jones and Richard Maltsbarger, who led the international division, as the two leading candidates to replace him as CEO.

At some point, the relationship between Jones and Niblock soured, though the parties dispute the reason for the rupture. Jones argues that Niblock disliked him because he favored another candidate, Maltsbarger, to eventually replace him as CEO. Lowe's insists that it was not seriously preparing to replace Niblock and things began to worsen when Jones reacted negatively to critical feedback on a performance review and began to disengage from the company.

4

In December 2015, Lowe's retained an outside consultant, the Hay Group, to compile performance reviews on executive leaders. J.A. 201-02. This process created misunderstanding and distrust. Jones testified that this review was being conducted to assess who should replace Niblock as CEO, and that the two leading candidates were him and Richard Maltsbarger. J.A. 214–15. Jones claims that the assessments were to be given to the Board of Directors in order to aid a decision about succession planning. Appellant Brief at 10. Jones also claims that the Chief Human Resources Officer, Maureen Ausura, confirmed this to him, though Ausura denied this in a deposition. J.A. 1821. Ausura did state in her deposition that she thought both Jones and Maltsbarger were viable candidates to eventually replace Niblock, but that there was no plan to give the assessments to the Board as part of its succession planning. J.A. 1812. Ausura's successor, Jennifer Weber, also testified that there was never a plan to deliver these assessments to the Board. J.A. 1882. Dr. Rivers of the Hay Group testified that the assessments were not being compiled for imminent succession planning, that she expected Niblock to remain as CEO for at least three to five more years, and that the purpose of the assessments was to help improve Lowe's top executives. J.A. 338–43.

Jones argues that Niblock and Jennifer Weber manipulated the review process in order to boost Maltsbarger's chances of becoming CEO. Appellant Brief at 10 (citing statement by Weber that Niblock had a "clear affinity" for Maltsbarger). Jones' theory is that they fired him for resisting their manipulations of the review process. Jones also suggests there was racial tension between him and Niblock. For example, he claims that, during an executive retreat, Niblock took the group on a tour focusing on Charleston's

5

antebellum history not long after Dylann Roof murdered congregants of a local African-American church. J.A. 614. He also claims that a shoplifting presentation depicted all the shoplifters as black and that Niblock wanted Lowe's New York stores to support the NYPD after the death of Eric Garner. J.A. 614.

Lowe's argues that Niblock eventually fired Jones because he was "disengaged" and not fully committed to the company. By early 2016, Jones apparently believed that Niblock was going to push him out. While the Hay assessment was being prepared, Jones told Ausura (then the human resources leader) that he would voluntarily leave Lowe's if the company offered him "a fair package." J.A. 1810. Ausura testified that she tried to reassure Jones that no one wanted him gone and that he was a serious candidate to eventually replace Niblock. J.A. 1810. A few days later, Jones emailed a colleague asking for recommendations for a professional resume writer. J.A. 457. Jones then emailed a professional resume writer telling her he needed to revise his resume because he was looking for a CEO job. J.A. 460. Jones emailed himself in January 2016, outlining his grievances with Lowe's, telling himself he wanted a CEO role, and stating that his "timeline is too short to spend 3 to 5 years waiting for this business to figure this out." J.A. 463.

Nevertheless, in February 2016, Jones received an outstanding performance review for the prior year. The review contained an assessment of Jones' work from CEO Niblock, who made several positive statements about Jones. For example, he said, "Mike [Jones] has done a great job of upgrading the talent at the senior leadership level in his area." He also said, "Beyond the numerical diversity that exist in Mike's area, I am also seeing much

6

greater 'diversity of thought', which . . . I am optimistic . . . will help drive our success in the future." J.A. 650–54.

In April 2016, the Hay assessment was released. Jones and Lowe's agree that the Hay Group assessment was largely favorable to Jones. The summary said, for example, that "Mike is a strong and impactful leader with a keen eye for talent and a passion for getting results"; "makes tough calls and takes risks which drive the organization forward and position it for success"; and "is strong and confident, takes on challenges and acts in the best interest of the enterprise." J.A. 1080. The assessment included both praise and criticism of Jones from Niblock. On the positive side, Niblock called Jones "a well respected, experienced leader" who was "embraced by his team and the organization when he was brought in." J.A. 1111. He also praised Jones for "challeng[ing] his team" and "push[ing] them hard"; for "ma[king] changes for the better"; and for "build[ing] out his organization well." J.A. 1112. But the report also included some poor "leadership scores" for Jones. For example, the assessment scored Jones as showing "no evidence" that he "enables senior team effectiveness"— the only competency score of zero for either Jones or Maltsbarger. J.A. 1094. It also included some negative feedback from peers, including things like, "At times he can be inflexible; when his mind is made up that is it;" and "At times lets his emotions show through which could be off putting." J.A. 1116.

The parties dispute how Jones responded to his feedback. Jones claims that Dr. Rivers, who prepared the Hay assessment, demanded that he accept the negative feedback, including his low score on enabling senior team effectiveness. J.A. 240–43. Jones refused and said he could not do his job if he accepted that characterization. J.A. 243–44. Rivers

7

claims that Jones responded by asking why she wouldn't just "fire [him] now." J.A. 371. Rivers testified that she suggested rescheduling the meeting and that she was worried Jones "just didn't seem to engage." J.A. 372. Following that meeting, Jones updated his resume and started contacting recruiting firms making clear he was interested in a new job. J.A. 250.

A few weeks later, after Lowe's fired an employee that Jones liked, Jones claims that Jennifer Weber (the new head of human resources) again demanded that he accept the negative feedback he had gotten in the Hay assessment. J.A. 252, 489–91. Jones told Weber that he felt his job was threatened and that he would rather have a separation agreement than be fired. J.A. 252, 491. Jones told Niblock the same thing later that day, J.A. 491, and said he wanted a severance package. J.A. 254. Around the same time, Jones began removing boxes and other things from his office. J.A. 240. In addition to cleaning out his office, Jones also began keeping more notes about his frustrations with Lowe's. J.A. 488–507.

On June 16, Jones and Niblock met. Niblock asked if it was true that Jones had removed most of the things from his office. J.A. 1764. Jones said he was upset about the Hay assessment and that he wanted to be able to remove the rest of his things with one box if he got fired. J.A. 252–57. Niblock was unhappy about this and told Jones he needed to move on from the assessment. J.A. 263. Niblock said that he was "disappointed" and that it "was unacceptable for a senior executive to take action like that where others can notice and begin to start rumors as to what's going on." J.A. 1765. Jones admitted that Niblock told him he was being "childish for cleaning out [his] office." J.A. 256.

8

After this meeting, Niblock testified that he had concluded that Jones wanted to leave and was not engaged with the company. J.A. 1767–72. He testified that Jones was "less engaged" in the office and did not "check in" with Niblock as often as before. J.A. 1763. "His hours in the office dropped. At key off-site meetings, staff meetings, the amount in which Mike participated had dwindled. He . . . was not as engaged, not participating as much." J.A. 1763. And Niblock was bothered that people were talking about how Jones had "cleared items out" of his office. J.A. 1763. Further, Jones had told "at least a couple different people that his preference [was] just to have a severance package and move on." J.A. 1767. After the June meeting, Jones interviewed for jobs at Home Depot and Pier 1, both competitors of Lowe's. J.A. 471.

Others were concerned too. At an August Board of Directors meeting, one director asked, "[W]hat was going on with Mike?" J.A. 1768. Niblock told the directors that he had given Jones "a long period of time to be able to try and overcome his objections to the assessment so that we could move forward and get him back to being a productive member of the team, engaged." J.A. 1768. One of the directors, Morgan, later testified that Niblock told the Board that he "hoped" that Jones could "turn that around" but that "things needed to get better" for him "to remain an executive officer of the company." J.A. 2193. VP of Human Resources (Andrew Ellis) recommended firing Jones because he "had checked out from his job and from Lowe's." J.A. 466. Jones disputes this by presenting evidence he continued to work hard during this period.

In October 2016, Niblock terminated Jones. Niblock sent the Board of Directors a letter that same day stating he had terminated Jones for being disengaged. J.A. 683.

9

Subsequently, Weber made a presentation to the Board about CEO succession planning where she took the Hay assessment and excised all negative feedback about Maltsbarger. Appellant Brief at 34. Within a few years, the Board of Directors removed Niblock. Lowe's current CEO is Marvin Ellison, who previously was CEO of J.C. Penney. Ellison is African-American.

B.

Shortly thereafter, Jones demanded a severance package valued at over 9 million dollars and threatened to sue if he did not get it. J.A. 1578. With his offer not being accepted, Jones filed a three-count complaint in North Carolina state court in February 2017, alleging Lowe's violated 42 U.S.C. § 1981 by firing Jones on account of race, a § 1981 claim alleging retaliation, and a state-law claim for wrongful discharge. Local news outlets ran stories covering the lawsuit and quoting from Jones' complaint, which specifically alleged that several of Lowe's employees (including Weber) had histories of race discrimination. *See, e.g.*, *See* Paul Boyd, *Lawsuit claims Lowe's discriminated against a top executive because of race*, WSOCTV.com (Feb. 24, 2017), https://tinyurl.com/wbvnzjg. Lowe's then released a statement to a local news outlet denying Jones' allegations. The statement asserted that Jones' allegations were "irresponsible," that "his demeanor changed dramatically" following a leadership assessment of Lowe's senior executives, that instead of "embracing" the assessment, he searched for another job and "became increasingly disengaged in numerous ways." J.A. 508. Lowe's also stated that Jones demanded an "unreasonable severance package . . . over $9 million" and "threatened" to "damage [the company's] goodwill with the public" if

10

Lowe's did not agree to his demand. J.A. 508. In response to the Lowe's statement, Jones added a defamation claim to his lawsuit.

C.

In March 2017, Lowe's removed the case to federal court. After extensive and contentious discovery, the district court granted Lowe's motion for summary judgment on all counts. *See Jones v. Lowe's Cos., Inc.*, 402 F. Supp. 3d 266, 279 (W.D.N.C. 2019). On Jones' racial discrimination claim, the district court applied the *McDonnell Douglas* framework. Having concluded that Jones made out a *prima facie* case of racial discrimination, the court found that Lowe's met its burden of production to demonstrate a legitimate non-discriminatory reason for firing Jones: that he had become disengaged from his job. *Id.* ("Lowe's provides testimony and affidavits demonstrating that it fired Jones because Jones chose to resign when he removed his personal items from his office, repeatedly asked to be severed with a package, and disengaged from his role as one of Lowe's top executives."). At the final step of the *McDonnell Douglas* test, the district court found that Jones had failed to prove by a preponderance of the evidence that Lowe's reason for terminating Jones was pretextual. *Id.* at 280. The court pointed to testimony from CEO Niblock and a member of the Board of Directors showing repeated and ongoing discussions about Jones' disengagement from his job, and to undisputed evidence that CEO Niblock had expressed his concerns personally to Jones. *Id.* at 280–81. The district court also found Jones' theory of the case—that Niblock fired him because he wanted Maltsbarger to become CEO—implausible because the evidence suggested that the Hay assessment was not going to be given to the Board of Directors and that there was not an active process to

11

choose Niblock's successor as CEO. *Id.* at 281-82. The court also noted that Maltsbarger never in fact was chosen as CEO. *Id.* Finally, the district court noted that because Niblock had hired and promoted Jones within the prior few years and had nominated Jones to be his hit-by-a-bus successor as CEO, it was not plausible that Niblock discriminated against Jones on the basis of race. *Id.* at 282–83.

The district court also granted summary judgment on Jones' other claims. Because Jones' state-law wrongful discharge claim was governed by the same legal standard as his federal discrimination claim, the district court granted summary judgment on that claim. *Id.* at 284. In a decision that is not being appealed, the district court also granted summary judgment on Jones' retaliation claim. *Id.* at 283. Finally, the district court granted summary judgment on Jones' defamation claim, finding that Lowe's statements were either opinions or just true statements. In particular, the court found that Lowe's statements about Jones' lawsuits being "unfounded" were non-actionable opinions. *Id.* at 285. It also found that Lowe's statement that Jones demanded a nine-million-dollar buyout and threatened litigation if he did not get it was true. *Id.*

The district court also sealed a series of documents, a decision now challenged on appeal. The court ordered that more than one hundred records be unsealed; but it concluded that a number should remain sealed (but publicly filed in redacted form) because they contained sensitive business information or personal information about employees, and because in many instances the court did not even rely on the documents in rendering summary judgment. *Id.* at 286-95.

Jones filed a timely notice of appeal.

## II.

The district court had federal question jurisdiction under 28 U.S.C. § 1331, and it exercised supplemental jurisdiction over Jones' state-law claims under 28 U.S.C. § 1367. We have jurisdiction under 28 U.S.C. § 1291.

## III.

On appeal, Jones challenges the district court's grants of summary judgment in favor of Lowe's on his discrimination and defamation claims. He also disputes the district court's decision to seal part of the record.

This court reviews a grant of summary judgment *de novo* to determine if a genuine dispute of material fact exists, drawing all reasonable factual inferences in favor of the nonmoving party. *See Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). The court must look to substantive law to determine which facts are material—only those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment should be granted "unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented." *McLean v. Patten Cmtys., Inc.*, 332 F.3d 714, 719 (4th Cir. 2003).

The sealing of documents at summary judgment is reviewed for "abuse of discretion." *Pittston Co. v. United States*, 368 F.3d 385, 406 (4th Cir. 2004).[1]

A.

First, we address Jones' discrimination claims, concluding the district court properly granted summary judgment in favor of Lowe's. 42 U.S.C. § 1981 prohibits "nongovernmental discrimination" against the right of "all persons" to "have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." Both parties agree that Jones' claim is governed by this statute, and that the *McDonnell Douglas* burden-shifting framework applies. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). They also both agree that Jones' North Carolina discrimination claim is governed under this same standard.

The *McDonnell Douglas* framework is comprised of three steps: (1) the plaintiff must first establish a *prima facie* case of employment discrimination or retaliation; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment

---

[1] Jones disputes this, arguing we must review sealing determinations *de novo*. The cases he cites to support his argument, however, arose in a different context: We have applied *de novo* review to sealing rulings subject to First Amendment scrutiny when those rulings were challenged by the press or by media intervenors. *See Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004); *In re State-Record Co.*, 917 F.2d 124, 127 (4th Cir. 1990). But we have explicitly explained that Pittston's abuse of discretion standard of review governs motions by private litigants who had access to all the underlying documents in the proceeding. *Wash. Post*, 386 F.3d at 577 n.6.

14

action is a pretext and that the true reason is discriminatory or retaliatory. *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). The parties' sole dispute centers on the third step of the analysis: whether Lowe's stated reason for firing Jones was pretextual. At step three, the plaintiff bears the burden to prove "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 216.

Three considerations convince us the district court properly granted summary judgment on Jones' discrimination claims. First, there is ample evidence to support Lowe's stated reason for firing Jones: that Jones reacted negatively to criticism and became disengaged from the company. It seems obvious that any business—and especially a major international company, like Lowe's—depends on the complete commitment of its top executives. But Jones took concrete, observable actions that reasonably could have convinced his colleagues that he was eyeing an exit from the company. Jones talked about leaving the company and asked about separation packages multiple times to senior executives. *See* J.A. 254, 491. He removed boxes and other things from his office. J.A. 240. This highly visible action was apparently noticed by other company employees, leading Niblock to confront Jones about it. J.A. 263, 1764. And Jones was actively seeking new employment at the time, including with major competitors of Lowe's like Home Depot and Pier 1. J.A. 471.

And these actions convinced *multiple* key decisionmakers at Lowe's that Jones had become disengaged. There is strong evidence that these individuals were concerned about Jones' disengagement before he was fired. Aside from Niblock's testimony and his

15

confrontation with Jones about disengagement, a member of the board of directors asked, "[W]hat was going on with Mike?" just a couple months before his termination. J.A. 1768. Niblock told the directors that he had given Jones "a long period of time to be able to try and overcome his objections to the assessment so that we could move forward and get him back to being a productive member of the team, engaged." J.A. 1768. James Morgan, one of the Lowe's directors, testified that Niblock told the Board in August 2016 that Jones "had lost his focus, was less engaged, had moved stuff out of his office, [and] was sharing with other people that he . . . might be seeking a severance agreement." J.A. 2193. The VP of Human Resources recommended firing Jones because he "had checked out from his job and from Lowe's." J.A. 466. And when Niblock did fire Jones, he told the Board that the reason was because Jones had been disengaged from the company. J.A. 683.

Summary judgment is appropriate when, as here, the plaintiff has failed to present sufficient evidence to show that the employer's proffered reason is unworthy of credence or that a racially discriminatory reason more likely motivated the decision. *Price v. Thompson,* 380 F.3d 209, 217 (4th Cir. 2004) ("[I]t is axiomatic that the plaintiff must in fact provide sufficient evidence from which a reasonable trier of fact could find falsity."). This is not a case where the proffered non-discriminatory justification is undermined because the employer gave "shifting and inconsistent explanations," suggesting that the reason was pretextual. *E.E.O.C. v. Sears Roebuck & Co*., 243 F.3d 846, 853 (4th Cir. 2001). To the contrary, "the company's explanation for its action has remained a consistent one," warranting summary judgment. *Sharif v. United Airlines, Inc.,* 841 F.3d 199, 205 (4th Cir. 2016). Its reason was also well documented over several months and multiple high-ranking

16

decisionmakers at the company expressed this rationale. And Jones cannot claim unfair surprise at this reason. He acknowledges that Niblock expressed this concern to him, and yet Jones did nothing to assuage the concern.

Second, Jones' own evidence and theory fail to discredit Lowe's *bona fide* non-discriminatory reason for terminating him. In his briefs, Jones goes to great lengths to convince us that the Hay assessment was unfair to him and that it was biased in favor of his competitor, Maltsbarger. We confess that we are skeptical about Jones' theory. He did, after all, get mostly positive feedback from that assessment. And the evidence suggests the Hay assessment was not being used for imminent CEO succession planning, thus undercutting Jones' theory that Niblock and Jennifer Weber conspired to prevent him from becoming CEO. And Maltsbarger was never, in fact, made CEO.

But if Jones' discrimination claims turned on whether we believe his theory, they might survive summary judgment. After all, we must view the evidence in the light most favorable to Jones at the summary judgment stage of the lawsuit.

The bigger problem for Jones is that his theory is untethered from *race*, a necessary element of his claim under 42 U.S.C. § 1981. To state a claim, Jones must prove that race was a but-for cause of his firing. *See Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1019 (2020). As the Supreme Court explained just a few months ago, it is not enough to show that "race played 'some role' in the defendant's decisionmaking process." *Id.* at 1013 (quoting *Nat'l Ass'n of African American-Owned Media v. Comcast Corp.*, 743 Fed. App'x. 106, 107 (9th Cir. 2018)). Jones tells us that CEO Niblock and Jennifer Weber were conspiring to "undermine" his CEO candidacy

17

through the Hay assessment. Appellant Brief at 10. He tells us they did this because Niblock had a "clear affinity" for Maltsbarger. *Id.* To convince us of this affinity, he tells us how Maltsbarger was Niblock's "protégé" and that Niblock had elevated him through the company's ranks. *Id.* at 10, 13: Reply Brief at 20. But Jones fails to adequately connect his theory to *racial* discrimination. The federal civil rights laws make it unlawful to promote a white person over a black person *because* of race. *Comcast*, 140 S. Ct. at 1009 (requiring courts to ask "what would have happened if the plaintiff had been white?"). The burden is on Jones to show that racial considerations *caused* the adverse decision, but he fails to carry that burden. Jones tells us that Niblock favored his protégé, someone he had mentored and help rise through the ranks. Under Jones' own theory, Niblock favored Maltsbarger because of his longstanding mentor-mentee relationship with him, not because of his race. That is not enough to survive summary judgment. [2]

Finally, Jones' evidence of pretext is especially weak because the same people he accuses of race discrimination singled him out for advancement from the start of his employment at Lowe's. It is undisputed that Niblock approved of Jones' initial hiring and

---

[2] Sensing the loose relationship between his theory of why Niblock acted as he did and his race, Jones lodges bare allegations never presented to the district court or refers to incidents wholly unconnected to him. He alleges, for example, that Niblock allowed a tour of antebellum Charleston to proceed after Dylann Roof's horrific attack on a black church and that Niblock was supportive of the New York Police Department after the death of Eric Garner. We are given little sense of context here or told what positive connection this all has to the case at bar. *See Comcast*, 140 S. Ct. 1009 at 1019 (requiring evidence that discriminatory intent *caused* adverse employment action). If stray comments or opinions could give rise to liability and negate Niblock's altogether admirable efforts to advance Jones within the company, people of different races would hesitate to speak freely with one another, thus chilling workplace relationships and making a minefield of ordinary conversations.

was privy to a plan to quickly promote Jones to a senior executive position shortly thereafter. And that's exactly what Niblock did; he promoted Jones to a senior executive position reporting directly to him within about one year of his hiring. And the evidence strongly suggests Niblock considered Jones as a serious contender to replace him as CEO. Not only did Niblock propose Jones as his "hit by a bus" successor, an internal succession document listed Jones as one of the two candidates to become the next CEO. And for the most part, Niblock provided favorable feedback about Jones' work. It seems paradoxical that someone who was responsible for promoting Jones and consistently favoring his advancement would suddenly turn around and show him the door out of a sense of racial animus. *See Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991).

The fraying of Jones' relationship with Lowe's was unfortunate, especially as it appears that Jones gave the company some years of constructive service. But Jones has failed to create an issue of triable fact that the falling out was racial in character, as opposed to disengagement born of a mixed employee evaluation and frustration over the manner in which the CEO succession was seemingly playing out. As the district court noted, "no rational jury could find that Lowe's, through Niblock, was dishonest when it terminated him for disengaging from his role." *Jones*, 402 F. Supp. 3d at 282. We accordingly agree with the district court on this record that a grant of summary judgment was appropriate.

B.

We also affirm the district court's grant of summary judgment on Jones' defamation claim. In North Carolina, there are four circumstances in which a plaintiff may allege that a false publication constitutes defamation *per se*: "(1) [when the publication] charges that

19

a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to ridicule, contempt, or disgrace, or (4) it tends to impeach one in his trade or profession." *Ellis v. N. Star Co.*, 388 S.E.2d 127, 130 (N.C. 1990).

Jones takes issue with these statements by Lowe's:

1. "Any suggestion that Lowe's—or any individual executive at Lowe's— discriminated against Mr. Jones because of his race is completely unfounded and irresponsible."

2. "Mr. Jones' allegations have no basis in reality."

3. "Mr. Jones demanded an unreasonable severance package valued at over $9 million."

4. "Mr. Jones' demeanor changed dramatically following a leadership assessment process in which he and other Lowe's senior executives were evaluated."

5. "[Mr. Jones] increasingly became disengaged from Lowe's in numerous ways."

None of these statements provide the basis for a defamation claim. We can dispose of the first three statements easily. The first two statements are just opinions—rhetorical hyperbole that is not actionable in defamation law. This claim resembles that in *Tyson v. L'Eggs Prods., Inc.*, 351 S.E. 2d 834 (N.C. App. 1987), where the court found not actionable a company statement that an employee's claim was "hog wash." *Id.* at 840. The third statement contains both an opinion and a fact. The assertion that Jones' demand for a severance package was "unreasonable" is nonactionable under *Tyson*. As for the fact—that

Jones demanded a compensation package worth more than nine million dollars—Jones' lawyer admitted it was true. J.A. 1578.

Jones argues that the fourth and fifth statements are libelous *per se* because "false words imputing to a merchant or business man conduct derogatory to his character and standing as a business [man] and tending to prejudice him in his business are actionable, and words so uttered [or published] may be actionable per se." *Badame v. Lampke*, 89 S.E.2d 466, 468 (N.C. 1955). We conclude summary judgment as to these statements was appropriate on two bases.

First, North Carolina law makes clear that this is a narrow category of defamation *per se* and that it only covers statements asserting an employee is *incapable* of doing his job, as opposed to mere criticisms about job performance. As Judge Wynn explained when he served on the North Carolina Court of Appeals, North Carolina courts have "held consistently that . . . calling plaintiff 'dishonest' or charging that plaintiff was untruthful and an unreliable employee, are not actionable per se." *Losing v. Food Lion, LLC*, 648 S.E.2d 261, 264 (N.C. Ct. App. 2007). For example, saying an employee had "a poor attitude toward team building" was not actionable. *Jackson v. Mecklenburg Cty.*, No. 3:07-cv-218, 2008 WL 2982468, at *6–7 (W.D.N.C July 30, 2008). The statements made by Lowe's in this case are not actionable because they did not state that Jones was incapable of doing his job but were merely generalized criticisms.

Second, the company's statements were made to defend its reputation and were therefore qualifiedly privileged under *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541 (4th Cir. 1994). Jones's complaint contained incendiary allegations likely to damage the

21

company's reputation. For example, he alleged that the head of Lowe's human resources division had a reputation for terminating minority employees. The privilege of reply enables the party whose reputation is sullied to "publish, in an appropriate manner, anything which reasonably appears to be necessary to defend his own reputation against the defamation of another." *Id.* at 1559 n.19 (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 115, at 825 (5th ed. 1984)). Indeed, "a person under attack may properly allege . . . that his accuser is an unmitigated liar and the truth is not in him." Id. at 1562 (internal quotation marks and citation omitted). Because Jones commenced the verbal volley, Lowe's had the right to fire back at him. [3]

## IV.

For the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED.*

---

[3] Finally, we reject Jones' argument that the district court erred in sealing parts of the summary judgment record. Fatal to Jones' contentions on this issue is the fact that he failed to identify the individual documents he alleges should be unsealed in his opening brief. He fails also to respond to the district court's document-by-document analysis. J.A. 1661–67. Given these failures, we can identify no abuse of discretion in the district court's handling of this matter.

FLOYD, Circuit Judge, dissenting in part and concurring in part:

District courts are too quick to grant summary judgment, and we are too quick to affirm them. Because this case presents a classic instance of premature summary judgment, I cannot join the majority's holding as to Michael Jones's discriminatory discharge claims. I concur with the majority in all other respects.[1]

*    *    *

Lowe's claims that Jones was terminated for his disengagement. Jones states that, in reality, former-CEO Robert Niblock terminated Jones to ensure that Niblock's mentee—Richard Maltsbarger, a white man—would be named CEO successor. Jones argues that a jury should determine whether Lowe's stated reason for termination was pretextual in light of Niblock's desire for Maltsbarger to be named CEO successor. I agree.

---

[1] Though I concur in the majority's judgment as to the sealing of records, I believe the appropriate standard of review is de novo. In 1988, this Court held that "the more rigorous First Amendment [right of access standard, requiring de novo review,] should also apply to documents filed in connection with a summary judgment motion in a civil case." *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 252 (4th Cir. 1988); *see also In re State-Record Co.*, 917 F.2d 124, 127 (4th Cir. 1990). I acknowledge that we applied an abuse of discretion standard in *Pittson Co. v. United States*, 368 F.3d 385, 406 (4th Cir. 2004), but I believe *Pittson* applied the wrong standard. I do not believe *Pittson* was distinguishable from *Rushford*—as later panels have suggested—because the parties in *Pittson* were not members of the media; the same de novo standard should have applied regardless of the identity of the parties. *See Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004) ("The rights of access of the media 'are co-extensive with and do not exceed those rights of members of the general public.'" (quoting *In re Greensboro News Co.*, 727 F.2d 1320, 1322 (4th Cir. 1984)). The first-in-time case—*Rushford*—should control. *See McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) (en banc) ("When published panel opinions are in direct conflict on a given issue, the earliest panel opinion controls."). As such, I would review de novo. But because I would still affirm the district court under this standard, I concur in the majority's judgment as to the sealing of records.

The majority correctly cites to evidence, from Niblock's perspective, of Jones's disengagement. Yet in the summary judgment posture, our role is limited to determining whether Jones provided sufficient evidence that a reasonable trier of fact could find that the reason supplied by Lowe's pretextual. Viewing the evidence in the light most favorable to Jones, and drawing all reasonable inferences in his favor, I believe a jury could so find. Jones's evidence calls into question Niblock's assessment that Jones was disengaged by showing that (1) Niblock's attitude towards Jones—and his alleged desire to overcome Jones's positive assessments from a third party—occurred only *after* Jones and Maltsbarger were being considered for the title of CEO successor; (2) Jones was, in fact, a highly competent employee and received primarily positive feedback even up until his termination; and (3) Niblock's testimony lacks credibility because Niblock sought to appoint Maltsbarger as CEO successor.[2]

The majority disagrees, asserting that "Jones' own evidence and theory fail to discredit Lowe's *bona fide* non-discriminatory reason for terminating him." Majority Op. at 17. True, Jones's Hay Group assessments were wildly positive. But contrary to the majority's belief that the assessments "undercut[] Jones' theory that Niblock . . . conspired to prevent him" from being named CEO successor, *id.*, Niblock's discounting of the *third*

---

[2] The majority acknowledges in passing the district court's belief that Niblock was not invested in the selection of CEO successor because it "appears to have been a symbolic title, if not illusory." J.A. 1644. Though the role of CEO successor carried with it no pay raise or change in responsibilities, every company has a fiduciary responsibility to name one. And based on the $203,000 that Lowe's paid to the Hay Group to conduct a third-party assessment of the two potential CEO successor candidates, the Board of Directors apparently viewed the designation as important. J.A. 839. A jury could find that this was not just an illusory role, and that Niblock was highly invested in the selection process.

24

*party* assessments could be evidence of pretext. Drawing inferences in favor of Jones, the evidence shows that Niblock sought to find a way to discredit Jones—the superior candidate on paper—and advance Maltsbarger. The majority seems to admit this, noting that Jones "might survive summary judgment" based on this evidence. *Id.*

So instead of hanging its argument on its skepticism of Jones's theory, the deciding point for the majority appears to be that Jones's "theory is untethered from *race*, a necessary element of his claim." *Id.* (citing *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S Ct. 1009, 1019 (2020)). In discussing the absence of but-for causation, the majority states that "[u]nder Jones' own theory, Niblock favored Maltsbarger because of his longstanding mentor-mentee relationship with him, not because of his race." *Id.* at 17. Preliminarily, this vastly misconstrues Jones's theory. Jones never says this, and we do a disservice to the summary judgment standard by assuming that Niblock's "clear affinity" for Maltsbarger—the white candidate—was due to an existing mentor-mentee relationship, rather than race. J.A. 697. *See Woods v. City of Greensboro*, 855 F.3d 639, 652 (4th Cir. 2017) ("There is . . . a real risk that legitimate discrimination claims, particularly claims based on more subtle theories of stereotyping or implicit bias, will be dismissed should a judge substitute his or her view of the likely reason for a particular action . . . ."). To that end, I believe there is a genuine dispute of material fact for the jury regarding but-for causation: did Niblock seek Jones's termination so that a white candidate, rather than a Black one, would be named CEO successor?

The majority's but-for causation argument crafts a narrative not raised by either party, namely that Niblock's affinity for Maltsbarger stems from a mentor-mentee

relationship between the two, rather than race. Setting aside the fact that any theorizing about the true reasons for Niblock's "clear affinity" is a task for the jury, I also note the inherent flaws in the majority's narrative.

In theory, the majority's premise allows companies to use vague terms like "mentor-mentee relationship" to cover up race discrimination. I am deeply troubled that a panel of this Court, as a matter of law, is willing to state that an existing mentoring relationship precludes race from being a but-for cause for termination. I do not believe we should so easily justify Niblock's preference for white candidate Maltsbarger over Jones. Racism in today's workplace often no longer takes the form of overt, racist statements, instead relying on coded phrases to explain away preferences or differences between employees. Indeed, such sentiments—"it is not about race, it is about the fact that the white candidate is my mentee and the Black candidate is not"—epitomize modern-day workplace discrimination. And it is for a jury, not for us, to decide whether such statements can be given credence, or are mere smokescreens for racial bias.

The majority also ignores the fact that the very existence of such a relationship—and lack thereof between Niblock and Jones—could be due to race. Even if Niblock believes his preference for Maltsbarger is based on an existing relationship, a jury could find that Niblock's own biases led to the mentor-mentee relationship with or "clear affinity" for someone who looks like he does. Decades-worth of research teaches us that our own preferences are often driven by impulses to relate with the familiar rather than the foreign. *See generally* U.S. Equal Emp. Opportunity Comm'n, EEOC-CVG-2006-1, Section 15 Race and Color Discrimination (2006) (collecting sources). But we cannot

26

tolerate those biases, however subtle, in the law: implicit biases are as much a driver of workplace discrimination as external biases. *See Woods*, 855 F.3d at 651–62 ("Indeed, it is unlikely today that an actor would explicitly discriminate under all conditions; it is much more likely that, where discrimination occurs, it does so in the context of more nuanced decisions that can be explained based upon reasons other than illicit bias, which, though perhaps implicit, is no less intentional."); *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 59 (1st Cir. 1999) ("The Supreme Court has long recognized that unlawful discrimination can stem from stereotypes and other types of cognitive biases, as well as from conscious animus. . . . '[T]he entire spectrum of disparate treatment' is prohibited [under Title VII]." (quoting *County of Washington v. Gunther*, 452 U.S. 161, 180 (1981))). And again, it is for a jury to decide whether those biases drove Niblock and whether to give credence to his testimony as a result.

I do not know if Jones would have ultimately prevailed at trial, but I refuse to accept a narrative that credits—as a matter of law—coded language to explain away preferences for white rather than Black employees. At summary judgment, which "cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits," such assumptions, even if acceptable, are entirely premature. *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568–69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice and Procedure § 2728 (3d ed. 1998)). For these reasons, I must respectfully dissent from the majority's holding as to Jones's discriminatory discharge claims.